E-FILED
Friday, 03 February, 2023  01:14:13 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| Le'Andra Mosley, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: _____ |
| v. | **CLASS ACTION COMPLAINT** |
| Knox College Incorporated, | **JURY TRIAL DEMAND** |
| Defendant. | |

Plaintiff Le'Andra Mosley ("Plaintiff") brings this Class Action Complaint ("Complaint") against Knox College Incorporated ("Knox College" or "Defendant"), as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiff brings this Complaint against Knox College for its failure to properly secure and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including, but not limited to: full names; dates of birth; Social Security numbers; driver's license numbers (collectively, "personally identifiable information" or "PII").

2.      Defendant is a liberal arts college based in Galesburg, Illinois that offers students "more than 60 courses of study, including 42 majors and 57 minors in the arts, humanities, sciences, and social sciences."[1]

---

[1] https://www.knox.edu/academics

CLASS ACTION COMPLAINT

3.      Upon information and belief, former and current students, employees, and applicants for admission or employment are required to entrust Defendant with an extensive amount of their PII, used for Defendant's business, in order to enroll at Knox College or be eligible for employment. Defendant retains this information for at least many years.

4.      On November 24, 2022, Defendant "discovered unusual network activity and learned that it was a victim of a ransomware attack." [2] Defendant subsequently "initiated an investigation with the assistance of cybersecurity experts", and as a result of that investigation, Defendant concluded that "an unknown actor gained access to and obtained data from the Knox College network without authorization on or around November 24, 2022." [3]

5.      The information compromised in the Data Breach included individuals' full names, dates of birth, Social Security Numbers, driver's license numbers, and passport numbers. [4]

6.      Defendant's investigation concluded that the PII compromised in the Data Breach included Plaintiff's and approximately 63,000 other individuals' information. [5]

7.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

8.      Defendant failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect students' sensitive data. Hackers targeted and obtained Plaintiff's and Class

---

[2] The "Notice Letter". A copy of the letter is available at
https://oag.ca.gov/system/files/Knox%20College%20-%20Sample%20Notice.pdf
[3] Id.
[4] Id.
[5] https://apps.web.maine.gov/online/aeviewer/ME/40/7b58c10e-a23e-489f-bbbe-c69a2fbe5977.shtml

Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence, at the minimum, and violates federal and state statutes.

10.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; and (e) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

11.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a

CLASS ACTION COMPLAINT

continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## PARTIES

### Plaintiff Le'Andra Mosley

12.     Plaintiff Mosley is and has been at all relevant times a resident and citizen of Illinois, currently residing in Galesburg, Illinois. Ms. Mosley received the Notice Letter, via U.S. mail, directly from Defendant, dated January 3, 2023.

13.     If Ms. Mosley had known that Defendant would not adequately protect her PII , she would not have provided her PII to Defendant or allowed Defendant to maintain this sensitive and PII .

### Defendant Knox College

14.     Defendant is a private liberal arts college in Illinois, with its principal place of business located at 2 East South Street, Galesburg, Illinois 61401.

15.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

16.     All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of

CLASS ACTION COMPLAINT

$5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[6]

18.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in Illinois, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

19.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### *Background*

20.     Defendant is a private liberal arts college based in Galesburg, Illinois that offers students "more than 60 courses of study, including 42 majors and 57 minors in the arts, humanities, sciences, and social sciences."[7]

21.     Plaintiff and Class Members are or were students at Knox College or provided Defendant with the relevant PII for some other purpose (*e.g.,* employment or application for employment or study).

22.     To enroll in classes or other programs at Defendant, Plaintiff and Class Members were required to provide sensitive and confidential PII, including but not limited to: their names, dates of birth, and Social Security numbers. The same or similar information was provided by other victims of this Data Breach, including employees of Defendant or applicants for employment or admission.

---

[6] According to the Massachusetts Attorney's General office, 395 Massachusetts residents were impacted in the Data Breach. *See* https://www.mass.gov/doc/data-breach-report-2023/download
[7] https://www.knox.edu/academics

23.     Upon information and belief, Defendant made promises and representations to its students, including Plaintiff and Class Members, that the PII collected from them as a condition of enrollment would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

24.     Indeed, Defendant's Information Security Policy provides that: "data and information maintained by the College must be handled and managed in accordance with state and federal law and College policy."[8]

25.     Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII .

26.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

27.     Defendant had obligations created by FTC Act, contract, industry standards, common law, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

28.     Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[8] https://www.knox.edu/documents/HR/KnoxInformationSecurityPolicy%280%29.pdf

*The Data Breach*

29.     On or about January 3, 2023, Defendant began sending Plaintiff and other victims

of the Data Breach a Notice of Data Security Incident letter, informing them that:

**What Happened:** On November 24, 2022, Knox discovered unusual network activity and learned that it was the victim of a ransomware attack. We immediately took steps to secure our network and initiated an investigation with the assistance of cybersecurity experts. The investigation revealed that an unknown actor gained access to and obtained data from the Knox network without authorization on or around November 24, 2022. On December 7, 2022, after a comprehensive review of the potentially impacted data, Knox determined that personal information may have been involved. Since that time, Knox has worked diligently to identify current contact information needed to notify all potentially affected individuals.

**What Information Was Involved:** The information affected may have included your name, address, date of birth, Social Security number, driver's license number, and passport number.

**What We Are Doing:** As soon as Knox discovered the incident, we took the steps referenced above. In addition, we reported the incident to the Federal Bureau of Investigation and will cooperate with any investigation. We also implemented additional security features to reduce the risk of a similar incident occurring in the future and will continue to evaluate ways to further enhance the security of our network as the investigation progresses. Additionally, we are providing you with information about steps you can take to help protect your personal information. In addition, we are offering you complimentary credit monitoring and identity protection services for <> months through IDX, a national leader in identity protection services. The IDX services, which are free to you upon enrollment, include a subscription for the following: single bureau credit monitoring, CyberScan dark web monitoring, fully-managed identity recovery services, and $1 million in identity theft insurance coverage. With this protection, IDX will help you resolve issues if your identity is compromised.

**What You Can Do**: Please review this letter carefully, along with the guidance included with this letter about additional steps you can take to protect your information. In addition, we encourage you to enroll in the credit monitoring and identity theft protection services we are offering through IDX. To receive credit monitoring services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.[9]

---

[9] *Notice Letter.*

30.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, whether Defendant's system is still unsecured, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

31.     Defendant confirmed that the Data Breach was the result of a ransomware attack but has failed to indicate whether the compromised information was retrieved or if it remains in the hands of cybercriminals.

32.     Ransomware attacks, like that experienced by Defendant, are a well-known threat to companies that maintain PII. Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue.[10] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence […] the initial assumption should be that data may have been exfiltrated."

33.     An   increasingly   prevalent   form   of   ransomware   attack   is   the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[11] In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[12] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a

---

[10] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at
https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends
[11]*The chance of data being stolen in a ransomware attack is greater than one in ten*, available at
https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/
[12] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

second/future extortion attempt."[13] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[14]

34.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

35.    The unencrypted PII of Plaintiff and Class Members may end up for sale to identity thieves on the Dark Web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

36.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII , such as encrypting the information or deleting it when it is no longer needed.

37.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[16]

38.    To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

---

[13] *Id*.

[14] *Id*.

[15] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 23, 2021).

[16] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 17, 2022).

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[17]

39.    To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….
- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic

---

[17] *Id.* at 3–4.

mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight

variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….
- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product

  notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[18]

40.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;
- Include IT Pros in security discussions
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[18] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Oct. 17, 2022).

**Build credential hygiene**

-   Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-   Monitor for adversarial activities
-   Hunt for brute force attempts
-   Monitor for cleanup of Event Logs
-   Analyze logon events;

**Harden infrastructure**

-   Use Windows Defender Firewall
-   Enable tamper protection
-   Enable cloud-delivered protection
-   Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[19]

41.     Given that Defendant was storing the PII of its current and former students, employees, and employee applicants, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

42.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of tens of thousands of current and former students, employees, and employee applicants, including Plaintiff and Class Members.

### *Defendant Acquires, Collects, and Stores the PII of Plaintiff and Class Members*

43.     Defendant has historically acquired, collected, and stored the PII of Plaintiff and Class Members.

---

[19] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Oct. 17, 2022).

44.     As a condition to enroll or obtain employment at Knox College, Plaintiff and Class Members are required to give their sensitive and confidential PII to Defendant. Defendant retains this information even after the relationship has ended and Defendant is no longer required to retain this information.

45.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

46.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

47.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

48.     Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect PII, demonstrating an understanding of the importance of securing PII.

49.     Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

50.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

***Defendant Knew or Should Have Known of the Risk because Educational Providers in Possession of PII are Particularly Susceptible to Cyber Attacks***

51.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store other medical information, like Defendant, preceding the date of the breach.

52.     Data breaches, including those perpetrated against educational institutions that store PII in their systems, have become widespread.

53.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[20]

54.     The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[21]

55.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals...because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[22]

56.     Defendant knew and understood unprotected or exposed PII in the custody of educational institutions, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

---

[20] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[21] *Id*.
[22] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).

57.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

58.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII .

59.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

60.     In the Notice Letter, Defendant makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

61.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

62.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63.     As an educational provider in custody of students', employees', and employee applicants' PII, Defendant knew, or should have known, the importance of safeguarding PII entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Personally Identifiable Information*

64.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[23] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[24]

65.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[25] For example, Personal Information can be sold at a price ranging from $40 to $200,

---

[23] 17 C.F.R. § 248.201 (2013).
[24] *Id.*
[25] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

and bank details have a price range of $50 to $200.[26] Criminals can also purchase access to entire

company data breaches from $900 to $4,500.[27]

66.     Social Security numbers, which were compromised for some of the Class Members

as alleged herein, for example, are among the worst kind of PII to have stolen because they may

be put to a variety of fraudulent uses and are difficult for an individual to change. The Social

Security Administration stresses that the loss of an individual's Social Security number, as is the

case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other
> personal information about you. Identity thieves can use your number and your
> good credit to apply for more credit in your name. Then, they use the credit cards
> and don't pay the bills, it damages your credit. You may not find out that someone
> is using your number until you're turned down      for credit, or you begin to get
> calls from unknown creditors demanding payment for items you never bought.
> Someone illegally using your Social Security number and assuming your identity
> can cause a lot of problems.[28]

67.     What's more, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventive action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraud activity to obtain a new number.

68.     Even then, a new Social Security number may not be effective. According to Julie

Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[26] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:
https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-
dark-web/ (last visited Oct. 17, 2022).
[27] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-
dark/ (last visited Oct. 217, 2022).
[28] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*:
https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

69.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

70.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[30]

71.     Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[31]

72.     According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces

---

[29] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).
[30] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).
[31] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last accessed July 20, 2021)

of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.[32]

73.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[33] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[34]

74.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[35]

75.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

76.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may

---

[32] Sue Poremba, *What Should I Do If My Driver's License Number is Stolen?"* (October 24, 2018) (last accessed July 20, 2021)
[33] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed July 20, 2021)
[34] *Id.*
[35] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021
https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last accessed July 20, 2021)

CLASS ACTION COMPLAINT

continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

### Defendant Fails to Comply with FTC Guidelines

77.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

78.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[37]

79.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[38]

80.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the

---

[36] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).
[37] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[38] *Id.*

network; and verify that third-party service providers have implemented reasonable security measures.

81.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.    These FTC enforcement actions include actions against educational institutions.

83.    Defendant failed to properly implement basic data security practices.

84.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

85.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of their customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards*

86.    As noted above, experts studying cyber security routinely entities in possession of medical information as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

87.    Several best practices have been identified that a minimum should be implemented by educational institutions in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

88.     Other best cybersecurity practices that are standard in the higher-education industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

89.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.     These foregoing frameworks are existing and applicable industry standards in the higher-education industry, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES AND DAMAGES

91.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals,

the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; and (e) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Data Breach Increases Plaintiff's and Class Member's Risk of Identity Theft*

92.      The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

93.      The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

94.      Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

95.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

96.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

97.     Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

98.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords, signing up for credit monitoring and identity theft insurance, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

99.     Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in

which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."39

100.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

101.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:40



---

39 *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
40 "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at:
https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).

102.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

### Diminution of Value of PII

103.     PII is a valuable property right.[42] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

104.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[43]

105.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[44] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[45,46]

---

[41] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[42] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[43] See Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[44] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[45] https://datacoup.com/

[46] https://digi.me/what-is-digime/

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[47]

106.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

107.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

108.    The fraudulent activity resulting from the Data Breach may not come to light for years.

109.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

---

[47] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

110.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

111.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

112.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary

113.    Given the type of targeted attack in this case and sophisticated criminal activity, and the type of PII involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

114.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

115.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[48] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

116.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

117.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### Loss of Benefit of the Bargain

118.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant for services or accepting employment from Defendant under certain terms, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

---

[48] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

*Plaintiff Mosley's Experience*

119.     Plaintiff Mosley was a student at Knox College from approximately 2019 to 2022. As a Knox College Student, she was required to provide her PII to Defendant.

120.     At the time of the Data Breach—November 24, 2022— Defendant retained Plaintiff's PII in its system.

121.     Plaintiff Mosley is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

122.     Plaintiff Mosley received the Notice Letter, by U.S. mail, directly from Defendant, dated January 3 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, driver's license number, and passport number.

123.     As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: reviewing financial account statements for any indications of actual or attempted identity theft or fraud; changing passwords and resecuring her own computer system; and signing up for the credit monitoring and identity theft protection services offered by Defendant. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

124.     Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c)

the loss of benefit of the bargain (price premium damages); (d) diminution of value of her Private Information; and (e) the continued risk to her Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's Private Information.

125.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

126.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

127.    Plaintiff Mosley has a continuing interest in ensuring that her PII, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

128.    This action is properly maintainable as a class action. Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated.

129.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All individuals residing in the United States whose PII was compromised in the data breach first announced by Defendant on or about January 3, 2023 (the "Class").

> All individuals residing in the State of Illinois whose PII was compromised in the data breach first announced by Defendant on or about January 3, 2023 (the "Illinois Subclass").

130.    Excluded from the Class and Subclass are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

131.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 63,000 individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Maine's Attorney General's Office.[49] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

132.    Common questions of law and fact exist as to all members of the Class and Subclass that predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class and Subclass, which may affect individual Class members, include, but are not limited to, the following:

    a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

    b.    Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    c.    Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

    d.    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

---

[49] https://apps.web.maine.gov/online/aeviewer/ME/40/7b58c10e-a23e-489f-bbbe-c69a2fbe5977.shtml

e.   Whether and when Defendant actually learned of the Data Breach;

f.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.   Whether Defendant's conduct was an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200, *et seq*.; and,

l.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

133.   Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

134.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to

the Nationwide Class as a whole. Defendant's policies challenged herein apply to and affect Class

Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with

respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

135.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of

the Class Members in that she has no disabling conflicts of interest that would be antagonistic to

those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the

Class Members and the infringement of the rights and the damages she has suffered are typical of

other Class Members. Plaintiff has retained counsel experienced in complex class action and data

breach litigation, and Plaintiff intends to prosecute this action vigorously.

136.    Superiority and Manageability: The class litigation is an appropriate method for fair

and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will

permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the

adjudication of relatively modest claims by certain Class Members, who could not individually

afford to litigate a complex claim against large corporations, like Defendant. Further, even for

those Class Members who could afford to litigate such a claim, it would still be economically

impractical and impose a burden on the courts.

137.    The nature of this action and the nature of laws available to Plaintiff and Class

Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would

necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

138.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

139.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

140.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

141.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Code of Civil Procedure § 382.

**CAUSE OF ACTION I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

142.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

143.     Defendant required Plaintiff and Class Members to submit sensitive, non-public, personal information in order to enroll in one of Defendant's classes or programs or be eligible for employment.

144.     By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to design, implement, and monitor systems, policies, and processes by which it could reasonably prevent and detect a breach of their security systems in a reasonably expeditious period of time.

145.     Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected the PII.

146.     Defendant owed a duty of care to safeguard the PII due to the foreseeable risk of a data breach and the severe consequences that would result from its failure to so safeguard the PII .

147.     Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and the individuals that entrusted their PII to Defendant. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from the Data Breach.

148.     Defendant had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting

commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

149.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

150.    Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII . The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Class Members' PII;

    e.    Failing to detect in a timely manner that Class Members' PII had been compromised; and

    f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

151.    The breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches generally and in the higher-education industry.

152.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

153.    The imposition of a duty of care on Defendant to safeguard the PII it maintained is appropriate because any social utility of Defendant's conduct—of which little, if any, exists— is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

154.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

155.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and unsecure manner.

156.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**CAUSE OF ACTION II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

157.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

158.    Plaintiff brings this claim for unjust enrichment in the alternative to Count III (breach of express contract) and Count IV (breach of implied contract.

159.    Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monetary payments or labor for the purposes of obtaining education or employment at Knox College.

160.    Plaintiff and Class Members also conferred a monetary benefit on Defendant in the form of their PII, from which Defendant derived revenue as it could not provide education, employment, or services without the use of that PII.

161.    Defendant collected, maintained, and stored Plaintiff and Class Members' PII and, as such, Defendant had knowledge of the monetary benefits it received on behalf of the Plaintiff and Class Members.

162.    The money that Plaintiff and Class Members paid to Defendant, or the revenue Defendant derived from the use of their PII, should have been used to pay, at least in part, for the administrative costs and implementation of data security adequate to safeguard and protect the confidentiality of Plaintiff's and Class Members' PII. Additionally, employees conferred a monetary benefit on Defendant as part of their salary and benefits was intended to apply to adequate data security which Defendant did not apply.

163.    Defendant failed to implement—or adequately implement—those data security practices, procedures, and programs to secure sensitive PII, as evidenced by the Data Breach.

164.    As a result of Defendant's failure to implement data security practices, procedures, and programs to secure sensitive PII, Plaintiff and Class Members suffered actual damages in an amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiff's PII.

165.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement the data security measures adequate to safeguard and protect the confidentiality of Plaintiff's and Class Members' PII.

## CAUSE OF ACTION III
## BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiff and the Class)

166.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

167.    This count is plead in the alternative to Count II (Unjust Enrichment) above.

168.    Plaintiff and Class Members allege that they were the express, foreseeable, and intended beneficiaries of valid and enforceable express contracts between Defendant and its former and current students, employees, and employee applicants, contract(s) that (upon information and belief) include obligations to keep sensitive PII private and secure.

169.    Upon information and belief, these contracts included promises made by Defendant that expressed and/or manifested intent that the contracts were made to primarily and directly benefit the Plaintiff and the Class as Defendant's service was to provide education to the students and employment to its employees and employee applicants in exchange for tuition payments and/or labor from Plaintiff and the Class, but also safeguarding the PII entrusted to Defendant in the process of providing these services.

170.    Upon information and belief, Defendant's representations required Defendant to implement the necessary security measures to protect Plaintiff's and Class Members' PII.

171.    Defendant materially breached its contractual obligation to protect the PII of Plaintiff and Class Members when the information was accessed and exfiltrated by unauthorized personnel as part of the Data Breach.

172.    The Data Breach was a reasonably foreseeable consequence of Defendant's breach of these contracts.

173.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release, disclosure of their PII, the loss of control of their PII, the present risk of suffering additional damages, and out-of-pocket expenses.

174.    Plaintiff and Class Members are entitled to compensator, consequential, and nominal damages suffered as a result of the Data Breach.

## CAUSE OF ACTION IV
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

175.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

176.    When Plaintiff and Class Members provided their PII to Defendant in exchange for Defendant's educational services or employment, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information and to destroy any PII that it was no longer required to maintain.

177.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant on the other, is demonstrated by their conduct and course of dealing.

178.    Defendant solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

179.    In accepting the PII of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

180.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

181.    Plaintiff and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

182.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

183.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

184.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

185.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII or to destroy it once it was no longer necessary to retain the PII.

186.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

187.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

188.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

189.    As a direct and proximate result of Defendant's decision to profit rather than provide adequate security, and Defendant's resultant disclosures of Plaintiff's and Class Members' PII, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms of time and expenses mitigating harms, diminished value of PII, loss of privacy, and a present increased risk of harm.

## CAUSE OF ACTION V
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

190.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

191.    The State of Illinois recognizes the tort of Invasion of Privacy:

The elements of the cause of action typically are stated as: (1) the defendant committed an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matter intruded on was private; and (4) the intrusion caused the plaintiff anguish and suffering.

*Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71, 813 N.E.2d 1013, 1017 (2004).

192.    Plaintiff and Class Members had a reasonable expectation of privacy in the PII Defendant mishandled.

193.    Defendant's conduct as alleged above intruded upon Plaintiff's and Class Members' seclusion under common law.

194.    By intentionally failing to keep Plaintiff's and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

1.    Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

2.    Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

3.    Intentionally causing anguish or suffering to Plaintiff and Class Members.

195.    Defendant knew that an ordinary person in Plaintiff's or a Class Member's position would consider Defendant's intentional actions highly offensive and objectionable.

196.    Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' seclusion by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

197.    Defendant intentionally concealed from Plaintiff and Class Members an incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

198.    As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted. Defendant's conduct, amounting to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

199.    In failing to protect Plaintiff's and Class Members' PII, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private. Plaintiff, therefore, seeks an award of damages on behalf of herself and the Class.

**CAUSE OF ACTION VI**
**Violations Of Illinois' Personal Information Protection Act 815 ILCS 530/10(a)**
**(On Behalf of Plaintiffs and Illinois Subclass Members)**

200.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

201.    Plaintiffs bring this claim on behalf of herself and the Illinois Subclass Class.

202.    Section 10(b) of PIPA states, in pertinent part,

Any data collector that maintains or stores, but does not own or license, computerized data that includes personal information that the data collector does not own or license shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

815 ILCS 530/10(b).

203.    Defendant is a "data collector" as defined by the statute; it is an educational institution that "handles, collects, disseminates, or otherwise deals with nonpublic personal information. 815 ILCS 530/5.

204.    Plaintiff's claims are based on their status as an "owner" of their personal information.

205.    Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach.

206.    Section 45 of Illinois's Personal Information Protection Act requires entities who maintain or store "personal information concerning an Illinois resident" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure."

207.    Defendant's conduct violated the Personal Information Protection Act.

208.    Specifically, Defendant voluntarily undertook the act of maintaining and storing Plaintiff's and Class Members' PII, but Defendant failed to implement safety and security procedures and practices sufficient to protect from the data breach that it should have anticipated. Defendant should have known and anticipated that data breaches were on the rise and that educational institutions were lucrative or likely targets of cybercriminals looking to steal PII. Correspondingly, Defendant should have implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the data breach.

209.    As a result of Defendant's violation of the Personal Information Protection Act, Plaintiff and the Class Members incurred economic damages, including expenses associated with necessary credit monitoring.

**CAUSE OF ACTION VII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(On Behalf of Plaintiffs and the Illinois Subclass)**

210.    Plaintiff and the Class re-allege and incorporate by reference all of the allegations previously set forth herein.

211.    Plaintiff and the Illinois Subclass are "consumers" as that term is defined in 815 ILL. COMP. STAT. § 505/1(e).

212.    Plaintiff and the Illinois Subclass, and SSH are "persons" as that term is defined in 815 ILL. COMP. STAT. § 505/1(c).

213.    Defendant is engaged in "trade" or "commerce," including the provision of services, as those terms are defined under 815 ILL. COMP. STAT. § 505/1(f).

214.    Defendant engages in the "sale" of "merchandise" (including educational services) as defined by 815 ILL. COMP. STAT. § 505/1(b) and (d).

215.    Defendant's acts, practices, and omissions were done in the course of its business of marketing, offering for sale, and selling educational services in the State of Illinois.

216.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Illinois CFA) in violation of the Illinois CFA, including, but not limited to, the following:

    1.    failure to maintain adequate computer systems and data security practices to safeguard current and former patients' PHI and PII;

2.   failure to disclose the material fact that its computer systems and data security practices were inadequate to safeguard the personal information it was collecting and maintaining from theft;

3.   misrepresenting material facts to Plaintiffs and the Illinois Subclass, in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's' and Illinois Subclass members' PII from unauthorized disclosure, release, data breaches, and theft;

4.   misrepresenting material facts to the class, in connection with the sale of goods and services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's and Illinois Subclass members' PII, and

5.   failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Illinois Subclass members' PII from further unauthorized disclosure, release, data breaches, and theft.

217.   In addition, Defendant's failure to disclose that its computer systems were not well-protected and that Plaintiff's and Illinois Subclass members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Illinois Subclass; and (b) defeat Plaintiff's and Illinois Subclass members' ordinary, foreseeable and reasonable expectations concerning the security of their PII on Defendant's servers.

218. Defendant intended that Plaintiff and the Illinois Subclass rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's offering of goods and services and storing Plaintiff's and Illinois Subclass members' PII on its servers, in violation of the Illinois CFA.

219. Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of class members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach.

220. These unfair acts and practices violated duties imposed by laws including Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) and similar state laws.

221. Defendant's wrongful practices occurred in the course of trade or commerce.

222. Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to all Illinois Subclass members and were repeated continuously before and after Defendant obtained the PII from Plaintiff and Illinois Subclass members.

223. All Illinois Subclass members have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

224. As a direct and proximate result of Defendant's conduct, Plaintiff and Illinois Subclass members have suffered harm, including, but not limited to, lost or diminished value of PII; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and the continued and certainly increased risk to their PII which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

225.    Plaintiff and the Illinois Subclass are entitled to damages in an amount to be proven at trial.

226.    Pursuant to 815 ILL. COMP. STAT. § 505/10a(a), Plaintiff seeks actual, compensatory, and punitive damages (pursuant to 815 ILL. COMP. STAT. § 505/10a(c)), injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the Illinois CFA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable

CLASS ACTION COMPLAINT

regulations, industry standards, and federal, state or local laws;

iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.   prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's

information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

CLASS ACTION COMPLAINT

xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: February 3, 2023                    Respectfully Submitted,

                              /s/    *Gary M. Klinger*
                              Gary M. Klinger
                              **MILBERG COLEMAN BRYSON
                              PHILLIPS GROSSMAN, PLLC**
                              227 W. Monroe Street, Suite 2100
                              Chicago, IL 60606
                              Tel.:    (866) 252-0878
                              Email: gklinger@milberg.com

                              *Attorney for Plaintiff and the Putative Class*